Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| **MALIK SIMMONS,** | : | |
| | : | |
| **Petitioner,** | : | **Civil No. 15-7551 (ES)** |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **STEPHEN JOHNSON, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

_____:

SALAS, DISTRICT JUDGE

Petitioner, Malik Simmons, is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted in 2007 of first-degree purposeful or knowing murder, third-degree unlawful possession of a weapon, and second-degree possession of a handgun for the unlawful purpose of using it against the person or property of another. He is currently serving an aggregate forty-year sentence with an eighty-five percent period of parole ineligibility pursuant to New Jersey's No Early Release Act ("NERA"). N.J. Stat. Ann. § 2C:43-7.2. For the reasons set forth below, the Petition will be denied and a certificate of appealability shall not issue.

## I.    BACKGROUND

The factual background and procedural history in this matter were summarized in part by the New Jersey Superior Court, Appellate Division, upon Petitioner's appeal from the denial of his first petition for Post-Conviction Relief.[1] (*See* D.E. No. 7-22 at 2-3).

> A jury found codefendants Raheem Venable and Malik Simmons
> guilty of purposeful or knowing murder, in violation of *N.J.S.A.*

---

[1]    The facts found by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

2C:11-3(a)(1), (2); possession of a handgun without a permit, in violation of *N.J.S.A.* 2C:39-5(b); and possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39-4(a). The trial court sentenced Venable to life imprisonment, subject to the sixty-three year and nine-month period of parole ineligibility mandated by the No Early Release Act (NERA), *N.J.S.A.* 2C:43-7.2, for the murder, and a concurrent ten-year term of imprisonment for possession of a handgun without a permit. The court sentenced Simmons to a forty-year term of imprisonment, subject to the thirty-four year period of parole ineligibility mandated by NERA for the murder, and a concurrent five-year term for possession of a handgun without a permit. The court merged defendants' convictions for possession of a weapon for an unlawful purpose.

Defendants' convictions were based on the death of Fahiym Phelps as a result of a shooting outside a bar in Irvington on the night of November 27, 2004. Before the shooting, Phelps was inside the bar with his brother, Sharif, and a cousin, Tashon Young. During that time, Phelps had a verbal altercation with Venable, which was witnessed by Sharif, Young, and the manager of the bar, Sean Dubose. The altercation was interrupted by Dubose, who had a security guard, Michael Gibbs, escort Venable outside the bar, while Dubose stayed inside with Phelps.

The bar closed approximately ten minutes later, at which time Phelps, Sharif, and Young walked outside, where they encountered Venable and Simmons, both of whom were armed with handguns. Defendants began shooting in Phelps's direction, discharging between six and ten bullets. Six of the bullets struck Phelps, causing fatal injuries.

After the crime, Sharif and Young identified both Venable and Simmons as the shooters from photographic arrays shown to them by the police. Sharif and Young also identified Venable and Simmons as the shooters at trial. In addition, although he did not witness the shooting, Gibbs identified Venable as the person who had the altercation with Phelps and was escorted out of the bar. Neither Venable nor Simmons testified or presented any other witnesses in their defense.

[. . .]

The following additional facts are relevant to the issues raised in these appeals. [Sharif] and [Young] testified extensively on direct and cross-examination with respect to the events of that night and their observations of the shooting. According to [Sharif], on

2

> November 27, 2004, he rode with his friend, who he referred to as
> "Q", to the Steps bar where they planned to meet Phelps and
> [Young]. Once he and Q entered the bar they separated. He
> occasionally saw Q wandering around the bar. He did not know
> where Q was while Phelps and Venable were involved in the
> altercation inside the bar.
>
> [Sharif] testified Phelps and [Young] followed him out of the bar.
> Once outside, he stood by the fire hydrant trying to reconnect with
> Q, but he did not see him until after the shooting occurred. Phelps
> and [Young] continued to walk towards the corner of the building.
> At that moment, he heard gunshots and turned to see Phelps fall to
> his knees. He saw Venable and Simmons standing in front of Phelps,
> each shooting him several more times. [Sharif] said he ran to take
> cover, but after the shooting stopped he ran to Phelps' side.
>
> [Young] testified after he and Phelps exited the bar, within seconds
> he saw Venable, who he referred to as "the lighter one," pull out a
> gun from his red North Face jacket and shoot Phelps two times. He
> saw Phelps "go down." He then saw Simmons, the "dark skinned
> one," shoot him three more times. Together they shot Phelps about
> six times then ran off. [Young] said while standing next to Phelps,
> he was six and one-half to seven feet from Venable, and
> approximately two feet from Simmons. He stayed next to Phelps
> with [Sharif] until the police and ambulance arrived.

*State v. Simmons*, Nos. A-5565-11T3; A-1321-12T4, 2014 WL 6677148, at *1–2 (N.J. Super. Ct.

App. Div. Nov. 26, 2014) (internal citations omitted) (alterations in original).

Petitioner was sentenced on April 3, 2007. (*See* D.E. No. 8-14). On June 27, 2007,

Petitioner appealed to the Superior Court of New Jersey, Appellate Division. (*See* D.E. No. 7-5 at

2). The Appellate Division affirmed both his conviction and sentence in an unpublished opinion

issued on January 29, 2010. *See State v. Venable*, Indictment No. 05-05-1284, 2010 WL 322980

(N.J. Super. Ct. App. Div. Jan. 29, 2010). Petitioner appealed to the New Jersey Supreme Court,

but was denied certification. *See State v. Simmons*, 997 A.2d 230 (N.J. 2010).

Petitioner then filed a petition for post-conviction relief ("PCR") in the Superior Court of

New Jersey, Law Division in August 2010. (*See* D.E. No. 7-14). Following oral argument on

March 23, 2012, Petitioner was denied relief in a written opinion dated April 12, 2012. (*See* D.E. Nos. 8-16, 7-16, 7-17 & 7-18). Petitioner appealed the denial of his petition for PCR to the Appellate Division, but on November 26, 2014, Petitioner's appeal was denied. (*See* D.E. Nos. 7-19, 7-22). Petitioner then appealed to the New Jersey Supreme Court, but was denied certification on April 30, 2015. *See State v. Simmons*, 112 A.3d 593 (N.J. 2015).

On January 23, 2013, Petitioner filed a second petition for post-conviction relief in the Superior Court of New Jersey, Law Division. (*See* D.E. No. 8-2). It appears from the exhibits presented to this Court that Petitioner's second petition for PCR was denied on March 5, 2013. (*See* D.E. No. 8-3 at 2). It does not appear from the information provided that Petitioner appealed this denial. In December 2015, Petitioner subsequently filed what appears to be a third petition for PCR. (*See* D.E. Nos. 8-2 & 8-4). As of the time of the filing of the instant habeas petition on October 16, 2015, Petitioner's PCR was still pending before the Superior Court, Law Division.[2]

## II.     STANDARD OF REVIEW

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). Under the statute, as amended by the Anti–Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state

---

[2]     To the extent that a petitioner's constitutional claims are unexhausted or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)–(2).

Federal law is clearly established for these purposes where it is expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (alteration in original).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.' " *Id.* (quoting *United States v. Bendolph*, 409 F.3d 155,

173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas relief if the state court's decision rests on a violation of a state procedural rule. *See Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *Leyva*, 504 F.3d at 365–66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also Gray v. Netherland*, 518 U.S. 152 (1996); *see also Coleman v. Thompson*, 501 U.S. 722 (1991)). If a federal court determines that a claim has been defaulted, it may excuse the default only upon a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at 366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

## III.    ANALYSIS

Petitioner raises four grounds for relief. For the reasons explained below, the Court finds that Petitioner's claims do not warrant federal habeas relief.

### A.    Cross-Examination of Witness Sharif Phelps

In Ground One, Petitioner argues that his Sixth Amendment rights were violated when the trial court restricted cross-examination of witness Sharif Phelps regarding the issuance of a warrant for Sharif's arrest on theft charges. (*See* D.E. No. 3-1 at 6-9). Petitioner asserts that this restriction violated his rights under the Sixth Amendment's Confrontation Clause. (*See id.*). On direct appeal, the Appellate Division rejected Petitioner's argument, concluding that the trial court had placed a "reasonable limitation" on the scope of cross-examination because the issuance of the warrant had limited probative value when compared to its possible prejudicial effect on Petitioner. *See Venable*, Indictment No. 05-05-1284, 2010 WL 322980, at *8-9.

The record establishes that on the evening before Sharif was scheduled to testify at

Petitioner's trial, the South Orange Police Department attempted to arrest Sharif on an outstanding warrant for theft charges. (*See* D.E. No. 8-8 at 4). The charges and arrest warrant were unrelated to Petitioner's case. (*See id.*). Sharif was apparently not home at the time police arrived and the arrest was not effectuated. (*See id.*). After police left, Sharif's family contacted the prosecutor and expressed concerns that Sharif's anticipated testimony in the murder case could place him in danger if he were to be incarcerated on the warrant. (*See id.*). At trial the following day, the prosecutor relayed all of this information to the court. (*See id.* at 4-5). The prosecutor stated that she had made arrangements with the South Orange Police Department to have Sharif brought over to be processed after his testimony later that day. (*See id.* at 4). The South Orange detective with whom the prosecutor had spoken informed her that South Orange may consider lowering Sharif's bail amount or even releasing Sharif on his own recognizance. (*See id.*). The prosecutor made clear, however, that she had not requested that from the detective, nor had she asked for any other special treatment for Sharif. (*See id.*). The prosecutor then suggested that questioning Sharif about these arrangements should not be permitted, however, because Sharif would likely respond by, "express[ing] his fear of being locked up in the county and not protected from the individuals who he's testifying against." (*Id.* at 5). Defense counsel for co-defendant Venable stated, "I do tend to agree that that's not an issue that we should get into," while defense counsel for Petitioner was silent. (*Id.*). The trial court agreed with the prosecutor, ruling that the probative value of the testimony about the warrant was minimal when weighed against the prejudicial effect of Sharif's fear of Petitioner and his co-defendant. (*See id.*). The trial court also concluded that there was "plenty of [other] bias [evidence] here for this witness that the defense could go into" without introducing testimony about the warrant. (*Id.*).

The Sixth Amendment provides individuals with the right "to be confronted with the

witnesses against him," including the "right to conduct reasonable cross-examination." *Wright v. Vaughn*, 473 F.3d 85, 93-94 (3d Cir. 2006). "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 316-17 (1974). A criminal defendant can therefore state a violation of his rights under the Confrontation Clause by "showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis*, 415 U.S. at 318). However, the Confrontation Clause is not unlimited in scope; cross-examination is still subject to the discretion of trial judges to curtail improper questioning and to limit repetitive and otherwise irrelevant testimony on cross-examination. *See Wright*, 473 F.3d at 93. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall,* 475 U.S. at 679. Moreover, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (emphasis in original).

Here, the Appellate Division's adjudication of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner argues that cross-examination of Sharif about the pending arrest warrant would have impeached Sharif's credibility by demonstrating that he may be testifying with the hope of receiving favorable treatment from the State in his own criminal matter. (*See* D.E. No. 3-1 at 6-9). Yet, the Appellate Division found,

in recognizing the appropriate limitations that a trial court may place upon cross-examination of a witness, that the trial court had reasonably limited the cross-examination of Sharif.  *Venable*, 2010 WL 322980, at *9.  The Appellate Division reasoned that the trial court "only precluded testimony about the warrant, and [Sharif]'s fear of incarceration on that warrant.  Therefore, if [Petitioner] thought the credibility of Sharif's identification of [the co-defendants] could be undermined by seeking to show that [Sharif] hoped, by his trial testimony, to curry favor with the prosecutor, defendants could have pursued that line of cross-examination."  *Id.*  In other words, the trial court did not unconstitutionally prohibit Petitioner from engaging in otherwise appropriate cross-examination intended to elicit the witness' bias, but rather the trial court, in its discretion, limited the scope of the cross-examination to avoid undue prejudice to Petitioner.  *Van Arsdall,* 475 U.S. at 679-70.  This reasoning of the Appellate Division is directly on point and consistent with *Van Arsdall* and other Supreme Court precedent.  Thus, the New Jersey state courts' adjudication of Petitioner's claim was not contrary to, or an unreasonable application of clearly established federal law and Petitioner is not entitled to habeas relief on this claim.

### B.    Exclusion of Family Members from Trial

In Ground Two, Petitioner contends that his Sixth Amendment right to a public trial was violated when the trial court excluded members of his family, his co-defendants' family, and the victim's family from the courtroom during voir dire.  (*See* D.E. No. 3-1 at 9-10).  Specifically, Petitioner argues that when the trial court closed the courtroom to family members, the judge failed to make the requisite findings as to what overriding interest required the closure of the courtroom to family members, failed to explore alternatives to the closing the courtroom to those family members, and failed to articulate findings adequate to justify the closure.  (*See id.* at 10).

The Sixth Amendment to the United States Constitution guarantees a defendant the right

to a public trial.  *See* U.S. Const. amend. VI.  The closure of a courtroom during trial, including jury selection, may be considered a violation of a defendant's Sixth Amendment right.  *See Waller v. Georgia,* 467 U.S. 39, 46 (1984); *see also Presley v. Georgia,* 558 U.S. 209 (2010) (per curiam*)* (holding that a defendant's right to a public trial extends to jury selection, as well as other portions of the trial).  Violations of the right to a public trial are deemed structural errors, or errors which "affect the framework within which the trial proceeds" and which can entitle a defendant to an automatic reversal of their conviction.  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907-10 (2017) (internal quotation marks omitted) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

However, there are exceptions to the right to an open trial.  *See Waller*, 467 U.S. at 45. "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Id.; see also Weaver*, 137 S. Ct. at 1910 ("[W]hile the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint.")  While under certain circumstances a closure may be justified, the circumstances must be balanced with the aims of the Sixth Amendment's public trial guarantee.  *See id.*  Those values advanced by the public trial guarantee are: "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller*, 467 U.S. at 46-47).  The Supreme Court has provided the following test for courts to apply:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Presley*, 558 U.S. at 214 (quoting *Waller*, 467 U.S. at 48).

In the instant case, the trial court *sua sponte* requested that members of the defendants' and victim's families exit the courtroom for jury selection. (*See* D.E. No. 8-6 at 19). Prior to the jury being seated in the courtroom, the trial court requested the following:

> Are there individuals here from either the defense' family or the victim's family because if so I don't want anybody from either family in the courtroom during jury selection because we're going to have 85 jurors, and the courtroom is just going to be too crowded. I don't, for security reasons, I don't want members of the defendants' family or the victim's family in the courtroom during jury selection.

(D.E. No. 8-6 at 19).

Petitioner's trial counsel did not object to the closure, and trial counsel for Petitioner's co-defendant assented to the request, stating, "Oh, okay. No problem." (*Id.*).

Although the matter had not been objected to at trial, Petitioner raised the issue on direct appeal, arguing that his Sixth Amendment rights had been violated by the courtroom's closure. *See Venable*, 2010 WL 322980, at *2. In rejecting Petitioner's argument, the Appellate Division relied on the triviality standard set forth in *Peterson v. Williams*, 85 F.3d 39, 42-44 (2d Cir. 1996). *See Venable*, 2010 WL 322980, at *10. In *Peterson*, the Second Circuit established a test that considered the values advanced by the Sixth Amendment and examined whether the closure was "too trivial" to have violated a defendant's right to a public trial. *See id.* at 43-44. Specifically, the triviality standard considers "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant-whether otherwise innocent or guilty-of the protections conferred by the Sixth Amendment." *Id.* at 42. Significantly, the triviality standard is not intended to replace the test set forth by the Supreme Court in *Waller* for determining whether a court has violated a defendant's right to a public trial. *See United States v. Perry*, 479 F.3d 885,

889-90 (D.C. Cir. 2007) (citing *United States v. Ivester*, 316 F.3d 955, 958 (9th Cir. 2003)). Rather, the triviality standard is meant to be applied before the *Waller* test in order to "determine whether the [Sixth Amendment] right attaches[.]" *Ivester*, 316 F.3d at 958.

Although the triviality standard has not been addressed by the Supreme Court, it has been adopted by numerous federal circuit courts. *See, e.g.*, *Gibbons v. Savage*, 555 F.3d 112, 119-21 (2d Cir. 2009); *Perry*, 479 F.3d at 889-91; *Ivester*, 316 F.3d at 958-60; *Braun v. Powell*, 227 F.3d 908, 917-20 (7th Cir. 2000); *United States v. Al Smadi*, 15 F.3d 153, 154-55 (10th Cir. 1997). Significantly, the Third Circuit has also applied the triviality standard to courtroom closures. *See United States v. Greene*, 431 F. App'x 191, 195-97 (3d Cir. 2011) (holding that a closure where the defendant's brother was temporarily excluded from trial was "limited in scope and duration" and therefore, "unlikely to jeopardize the aims served by the public trial guarantee").

Here, the Appellate Division held that the closure of the courtroom was too trivial to have violated Petitioner's Sixth Amendment right. *See Venable*, 2010 WL 322980, at *12. The court reasoned the closure was "trivial" because it was limited only to the defendants' and victim's family, neither defense counsel objected, and there was no evidence demonstrating that any family members had even been present in court that day. *See id.* Accordingly, the court held that, "the claimed denial of the right to a public trial in this case is not merely trivial but hypothetical[,]" and did not warrant reversal of Petitioner's conviction. *Id.*

In the instant Petition, Petitioner has failed to demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law. Although Petitioner appears to argue that the trial court should have applied the *Waller* standard rather than the triviality standard, the application of the triviality standard by the Appellate Division was not contrary to, or an unreasonable application of, federal law. Where the *Waller*

test is used "only if closing the courtroom implicates the defendant's Sixth Amendment right", the triviality standard is used to determine whether the closure is "too trivial" to even amount to a violation. *See Perry*, 479 F.3d at 889-90. In Petitioner's case, the Appellate Division determined that the actions of the court and the effect they had on the conduct of the trial did not deprive Petitioner of the protections conferred by the Sixth Amendment, and therefore, Sixth Amendment protections did not attach. *See Ivester*, 316 F.3d at 958.

Additionally, "the lack of a Supreme Court holding on a specific issue precludes a finding that a state court decision on that issue was contrary to or an unreasonable application of clearly established federal law." *Rosen v. Kerestes*, No. 15-4539, 2018 WL 4030740, at *1, n. 1 (E.D. Pa. Aug. 22, 2018) (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). As mentioned previously, the Supreme Court has never confronted a set of facts that are materially indistinguishable from the facts in this case and arrived at a different result. Accordingly, the Appellate Division's decision cannot be said to have been contrary to clearly established federal law. *See Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam).

Finally, even if the Appellate Division's use of the triviality standard was in error, this Court still finds that Petitioner's claim fails because he waived his right to a public trial. The Supreme Court has held that the "failure to object to [the] closing of courtroom is [a] waiver of [the] right to [a] public trial[.]" *Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960)). Here, Petitioner's counsel did not object to the trial court's closure of the courtroom. Petitioner, therefore, is deemed to have waived his right to have the public present during voir dire.

Accordingly, Petitioner is not entitled to relief on this claim.[3]

---

[3]    The same claim was also raised by Petitioner's co-defendant, Raheem Venable, in Mr. Venable's separate § 2254 habeas petition. *See Venable v. Johnson, et al.,* Civil No. 15-6958, 2016 WL 6662686, at *5 (D.N.J. Nov. 10,

### C.        Newly Discovered Evidence

In Ground Three, Petitioner contends that he is entitled to a new trial based upon newly discovered evidence.  (*See* D.E. No. 3-1 at 11).  Petitioner asserts that after the trial ended, he received a certification from an individual named Laquan Jordan, which "places doubt on the integrity of the statements of the State's sole witnesses Sharif Phelps and Tashon Young whose identification of the Petitioner led to his conviction."  (*Id.*).

The certification from Mr. Jordan, who also goes by the name "Q", states that on the night of the murder, he was with Sharif Phelps at Steps.  (*See* D.E. No. 8-17 at 9).  After the shooting, the two men ran to the front of the bar where they saw Fahiym lying on the ground.  (*See id.*).  The two men saw Mr. Young with Fahiym, but when Sharif asked what had happened Mr. Young responded that he did not know.  (*See id.*).  Mr. Young stated that he had been "talking to some girl" and when he heard gunfire he "jogged off until the shooting stopped."  (*Id.*).  Mr. Young "managed only to get a glance of a tall dark skin guy who ran from the scene with a gun."  (*Id.*).  Mr. Jordan's certification goes on to state that despite knowing that Sharif and Mr. Young had falsely informed police that they had seen the shooters, Mr. Jordan did not want to become involved because "Sharif was my boy and he had just lost his brother and I didn't know the guys who were identified as the shooters."  (*Id.* at 10).  However, upon learning that Raheem Venable had been sentenced to life in prison, Mr. Jordan decided that he could no longer remain silent about what he knew.  (*See id.*).

Following oral argument, the PCR court rejected Petitioner's claim and the Appellate

---

2016).  The Honorable Susan D. Wigenton, U.S.D.J., analyzed the claim and also found that not only had the petitioner waived his Sixth Amendment right to a public trial by not objecting, but also that the courtroom closure at issue was "entirely too trivial to impugn Petitioner's right to a public trial."  *Id.* at 7.  Petitioner Venable's application for a certificate of appealability under 28 U.S.C. § 2253(c)(1) was denied by the Third Circuit on February 28, 2017, for "substantially the reasons given by the District Court[.]"  (*See Venable v. Johnson, et al.*, Civil No. 15-6958, D.E. No. 20 at 1.)

Division affirmed the denial substantially for the reasons set forth by the PCR court.  (*See* D.E.

No. 7-16 at 19-20); *see also Simmons,* 2014 WL 6677148, at *6.  In its decision, the PCR court

relied upon the standard for a new trial based upon newly discovered evidence set forth in *State v.*

*Ways,* 850 A.2d 440, 449 (N.J. 2004).  The *Ways* three-prong test provides, in pertinent part:

> To meet the standard for a new trial based on newly discovered
> evidence, defendant must show that the evidence is 1) material, and
> not "merely" cumulative, impeaching, or contradictory; 2) that the
> evidence was discovered after completion of the trial and was "not
> discoverable by reasonable diligence beforehand"; and 3) that the
> evidence "would probably change the jury's verdict if a new trial
> were granted."

*Id.* (quoting *State v. Carter*, 426 A.2d 501, 508 (N.J. 1981)).

The PCR court determined that Petitioner did not meet the *Ways* test because Mr. Jordan's

statement was not material evidence, but rather mere impeachment evidence against Sharif and

Mr. Young.  (*See* D.E. No. 7-16 at 20).  The PCR court held this new evidence did not suggest that

the defendants had been wrongly convicted.  (*See id.*).  Moreover, the PCR court held that the

evidence was not strong enough to have "probably change[d] the jury's verdict" since there were

several other witnesses who identified the co-defendants by clothing, description, and/or facial

tattoo who were not biased toward the defendants.  (*See id.*).

The standard applied by the PCR court for a new trial based upon newly discovered

evidence is nearly uniform to the standard applied by federal courts.  *See United States v. Cimera*,

459 F.3d 452 458-59 (3d Cir. 2006); *see also United States v. Vernace*, 811 F.3d 609, 620 (2d Cir.

2016); *United States v. Wolf*, 860 F.3d 175, 189-90 (4th Cir. 2017); *United States v. Metz*, 652

F.2d 478, 479 (5th Cir. 1981); *United States v. Glover,* 21 F.3d 133, 138 (6th Cir. 1994); *United*

*States v. Theodosopoulos*, 48 F.3d 1438, 1448 (7th Cir. 1995); *United States v. LaFuente*, 991 F.2d

1406, 1408 (8th Cir. 1993); *United States v. Wilkes,* 744 F.3d 1101, 1110 (9th Cir. 2014); *United*

*States v. DiBernardo*, 880 F.2d 1216, 1224 (11th Cir. 1989).

> Our sister circuits are in substantial agreement on the essential elements to be considered in evaluating a defendant's motion for a new trial pursuant to [Federal Rule of Criminal Procedure] Rule 33, and a majority has articulated a nearly uniform test. Each essentially requires that: (1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

*United States v. Owen*, 500 F.3d 83, 87-88 (2d Cir. 2007).

Additionally, the Supreme Court has held that "merely cumulative or impeaching [evidence] is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." *Mesarosh v. United States*, 352 U.S. 1, 9 (1956); *accord United States v. Beckman*, 787 F.3d 466, 493 (8th Cir. 2015); *Luke v. United States,* 942 F. Supp. 2d 154, 167 (D.D.C. 2013), *aff'd* No. 13-5169, 2014 WL 211305 (D.C. Cir. Jan. 13, 2014).

Here, Petitioner has failed to demonstrate that the New Jersey courts' adjudication of his claim was contrary to, or an unreasonable application of, federal law. The state courts applied the standard for a new trial based upon newly discovered evidence which mirrors the federal standard. And, the state courts found that not only was the newly discovered evidence was merely impeachment evidence rather than material evidence, but they also found that the evidence was simply not strong enough to have changed the jury's verdict. (*See* D.E. No. 7-16 at 20). Both of these findings negate relief under both the New Jersey *Ways* standard, and under the analogous federal standard for a new trial based upon newly discovered evidence. Additionally, the fact that the newly discovered evidence was found to be merely "impeachment" evidence is not a sufficient basis for the grant of a new trial under Supreme Court precedent. *See Mesarosh*, 352 U.S. at 9.

Accordingly, Petitioner has failed to demonstrate that the state courts' adjudication of his

claim was contrary to, or an unreasonable application, of clearly established federal law. Petitioner is therefore not entitled to relief on this claim.

### D.    Witness' Fear of Petitioner

In Ground Four, Petitioner argues that his right to a fair trial was compromised when, during summation, the prosecutor improperly introduced the issue of Sharif Phelps' fear of Petitioner and his co-defendant, despite the prosecutor's prior representation that she would not. (*See* D.E. No. 3-1 at 12). As discussed previously, the night before Sharif Phelps was scheduled to testify at Petitioner's trial, police attempted to execute an arrest warrant on him. (*See* D.E. No. 8-8 at 4). Although the police were unable to effectuate the warrant, Sharif was allegedly afraid of the co-defendants and was fearful that if he was placed into custody on the warrant that his life would be in danger from Petitioner and co-defendant Venable. (*See id.*). At trial the following morning, the prosecutor argued that Sharif should not be questioned about the arrest warrant in front of the jury, stating in pertinent part:

> I expect that if the witness is asked, you know, any questions in depth about the situation, he's going to express his fear of being locked up in the county and not protected from the individuals who he's testifying against, and I would submit that's probably an area we shouldn't go into.

(*Id.* at 5).

The trial court agreed with the prosecutor and ruled that neither side would be permitted to question Sharif about the arrest warrant because the possible prejudicial effect on the jury of hearing about Sharif's fear of the co-defendants outweighed the probative value of the jury's learning about Sharif's arrest warrant. (*See id.*).

During summation, however, Petitioner argues that the prosecutor improperly introduced the fact that Sharif was afraid of him and his co-defendant. (*See* D.E. No. 3-1 at 12). The

prosecutor stated, in pertinent part:

> Oh, all these people out there. Again, [Detective] Sue Bzik said to you -- Detective Bzik said, actually to [co-defendant's counsel] on cross, guess what, people are afraid. The people who came forward here, probably because Mr. Phelps, the father of Fayihm Phelps, brought them to headquarters or was influential in that. You think even Sharif Phelps wanted to be here? Do you think even Tashon Young wanted to be here? And it's their brother, and it's their cousin. People are afraid.
>
> And it's not China or Russia where we just corral people up and say we're detaining you until you tell us what we want to hear. That is not the reality of an investigation.
>
> It is not Myers' job to detain everybody at a scene. You think if there weren't other eye witnesses who were there, who would speak to the police, who would identify what they saw, that Sue Bzik wouldn't want to have taken statements from them? You must keep in mind the fear that is out there, the fear that permeated this investigation.

(D.E. 8-11 at 64-65).

Neither Petitioner's nor co-defendant Venable's defense counsel objected to the prosecutor's statements. Petitioner first raised this issue on direct appeal. *See Venable*, 2010 WL 322980, at *2. However, the Appellate Division summarily rejected the argument, stating: "Defendants' other arguments are clearly without merit and do no warrant discussion." *Id.* at *12.

Clearly established federal law states that a prosecutor's remarks during summation violate the Constitution only if they, " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). A prosecutor's remarks must also be examined within the context of the trial itself. *See United States v. Young*, 470 U.S. 1, 12 (1985).

If defense counsel's own comments during summation clearly invited a reply by the prosecutor, then a reviewing court "must not only weigh the impact of the prosecutor's remarks but must also take into account defense counsel's opening salvo." *Id.* at 12. "Thus the import of the evaluation has been that if the prosecutor's remarks were 'invited' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* at 12-13.

Here, it is important to review the prosecutor's remarks in the context of the entire trial. Detective Susan Bzik, who was the lead investigator in the case involving Petitioner, testified at trial. (*See* D.E. No. 8-10 at 74-76). On cross-examination of Detective Bzik, Petitioner's counsel repeatedly attempted to ascertain why police had not obtained additional witness statements.

> MR. BRESLOW [Petitioner's attorney]: Well, Officer Myer arrived. He said -- he said that there were seven, eight or 10 people out there?
>
> DETECTIVE BZIK: Yes.
>
> MR. BRESLOW: Did you inquire why he did not get statements from those people?
>
> DETECTIVE BZIK: They left the area.
>
> MR. BRESLOW: No. Is that what he said; they left the area? Is that what you're assuming?
>
> DETECTIVE BZIK: I don't know. I know that they had left the area.
>
> [. . .]
>
> DETECTIVE BZIK: A lot of people refuse to cooperate in this area. Unfortunately, people are afraid of retaliation in this area, and most people will not cooperate with police, or they will deny hearing or seeing anything.
>
> MR. BRESLOW: Wouldn't there be a statement in your report to that effect then that he interviewed seven, eight or 10 people, whatever is there, and they refused to get involved, they didn't see

anything, or they don't want to get involved?  For whatever reason there's nothing in your report that indicates that.

DETECTIVE BZIK: No, there is nothing in my report.

MR. BRESLOW: So we don't know who the seven, eight or 10 people are?

DETECTIVE BZIK: No, we do not.

MR. BRESLOW: That may have seen something --

DETECTIVE BZIK: If I was able to identify anyone else that had seen something, I would have taken a statement from them.

[. . .]

MR. BRESLOW: But you are aware that no other witness statements were taken, and no one spoke to any witnesses?

DETECTIVE BZIK: I tried to find witnesses.  I canvassed the area, and I was unable to find any.

MR. BRESLOW: I'm not questioning what you did.  I'm talking about what [responding officers] Officer Myer did and Officer Gatling?

DETECTIVE BZIK: Yes, I'm aware.

MR. BRESLOW: They did not -- you don't have any statements from any other witnesses, or is it in any of the reports that other witnesses were questioned, is that correct?

DETECTIVE BZIK: Yes, except for the individuals working at the bar.

MR. BRESLOW: I'm talking about the witnesses outside.

DETECTIVE BZIK: Okay.

MR. BRESLOW: Do you have anything in your report that indicates other people were questioned besides the brother and the cousin?

DETECTIVE BZIK: No, I do not.

[. . .]

DETECTIVE BZIK: [. . .] It is very normal for there to be crowds of people at a scene. The responding officers have a live victim. That's their first priority to -- to try to save his life.

MR. BRESLOW: Absolutely; for sure.

DETECTIVE BZIK: We did make a lot of attempt [sic] to find other people that may have had knowledge or may have been there. I can't investigate every house on that area and knock on every door. So these measures were taken. Every effort was taken in this case.

MR. BRESLOW: Except the effort of witnesses that actually saw it when it was done, when Officers Myers and Gatling responded?

DETECTIVE BZIK: Sir, as I explained to you, I know -- I don't think you responded to one of these scenes like I have. Most people do not cooperate.

MR. BRESLOW: I know. Go ahead. But that's most people.

DETECTIVE BZIK: Yes.

MR. BRESLOW: But there's no -- there's nothing in your report or anyone's report here that those people were ever even spoke to you [sic]. Am I right, or am I wrong?

DETECTIVE BZIK: What I have in my report were the people that were working in the bar that did cooperate.

MR. BRESLOW: Other than people in the bar I'm talking about?

DETECTIVE BZIK: The people outside the bar -- Sharif Phelps cooperated.

MR. BRESLOW: Yeah.

DETECTIVE BZIK: No one else would come forward, sir.

(D.E. No. 8-10 at 101-02; 104 & 108-09).

Following this cross-examination by Petitioner's trial counsel, trial counsel for co-defendant Venable cross-examined Detective Bzik, and continued to question why additional witnesses had not been interviewed.

> MR. SIMMS [co-defendant Venable's counsel]: As a matter of fact, if there were people standing outside who were there when there is a shooting, you could have held them as material witnesses, couldn't you?
>
> DETECTIVE BZIK: You could attempt to, but they would deny having any knowledge, in which case you couldn't really hold them.
>
> [. . .]
>
> MR. SIMMS: Did you ever go back to the bar on subsequent weekend nights to see if the witnesses who worked in the bar could recognize any of the people who might have been there the night of the shooting?
>
> DETECTIVE BZIK: I had asked the individuals who worked in the bar to try to remember the people, and if they had returned to the bar, to contact me.
>
> MR. SIMMS: But they didn't contact you, did they?
>
> DETECTIVE BZIK: No.
>
> MR. SIMMS: So are you assuming that nobody ever, who was there that night, ever came back to the bar?
>
> DETECTIVE BZIK: No.  I'm sure some people did, and I'm sure a lot of people did not want to get involved.  And then I believe the bar closed down for a period of time.
>
> [. . .]
>
> MR. SIMMS: From the beginning of this event it was a pretty shoddy investigation, wasn't it?

(*Id.* at 110 & 114-15).

During both defense attorney's summations, they argued that the investigation had been poorly handled and emphasized that more witnesses should have been interviewed.  (*See* D.E. No. 8-11 at 35-36).  During co-defendant Venable's summation, his defense attorney negatively referred to the police as "Keystone Cops", stating that the investigation was "lousy, lousy", and indicating that the reason more witnesses were not interviewed was because, "[t]he cousin and the

brother were all [the police] were interested in talking to." (*Id.* at 37; 36; 43). During Petitioner's summation, his trial attorney called the investigation "horrible," arguing that Detective Bzik, "obviously didn't do her job," and stating that Detective Bzik, "didn't want to interview people" because "she thinks it's a waste of time to interview people because they don't cooperate." (*Id.* at 47-48).

It is against this backdrop that the state prosecutor's closing remarks must be reviewed. When viewed in this context, it is clear that the prosecutor was not infringing upon Petitioner's constitutional rights, but rather her remarks were an invited reply to defense counsels' comments during summations. Both defense counsels' "opening salvo" was that the police had poorly handled Petitioner's case, in large part because police failed to interview more witnesses. The prosecutor's brief response in closing that "Detective Bzik said [. . .] people are afraid," and that fear "permeated this investigation", was an invited reply which did no more than "respond substantially in order to 'right the scale[.]' " *Young*, 470 U.S. at 12-13. Significantly, unlike Petitioner contends, the prosecutor never stated that Sharif was afraid of Petitioner or his co-defendant, nor did the prosecutor ever mention Sharif's fear of being in jail with Petitioner or his co-defendant. Accordingly, Petitioner has failed to demonstrate that the Appellate Division erred in denying his claim.

## IV.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate

to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right insomuch as Petitioner's claims are without merit, Petitioner's habeas petition is inadequate to proceed further and therefore, a certificate of appealability shall not issue.

## V.    CONCLUSION

For the reasons stated, Petitioner's habeas petition is DENIED and a certificate of appealability shall not issue. An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**